United States District Court
Southern District of Texas
Houston Division

United States Courts
Southern District of Texas
FILED

JUN 01 2020

David J. Bradley, Clerk of Court

Aristede Michael Johnson
   Petitioner,

v.

United States of America
   Respondent,

Case No.

H-96-176-01

Emergency Motion For A Reduction In Sentence Pursuant To 18 U.S.C § 3582(c)(1)(A)(i)

Comes Now, The Petitioner, Aristede M. Johnson, Pro-Se, Do Hereby Bring This Motion To The Court To Grant Compassionate Release By The Adherosion Of The Instructions Of The Centers For Disease Control (CDC) Via Social Distances, Sanitation, And To Prevent The Spread Of The Covid-19 Virus. The Petitioner, Do Hereby Respectfully Moves This Honorable Court, Judge Lee Rosenthal For An Order Of Home Confinement For The Remainder Of Petitioners' Sentence

## I.
## Jurisdictional & Authorization

This Honorable Court Has Jurisdiction To Entertain The Petitioner's Motion Pursuant To Title 18 USC 3582(c)(1)(A)(i)

## AUTHORITIES

A. Compassionate Release Before the First Step Act On December 21, 2018, the President signed into law the First Step Act, which, among other things, made significant changes to the statue governing compassionate release, 18 USC §3582(c)(1)(A)(i). The statue was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to re-assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225 at 121 (1983).

The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction," 18 USC 3582(c)(1)(A)(i). Congress delegated to the U.S. Sentencing Commission ("Commission") the responsibility of defining what were "extraordinary and compelling reasons," see 28 USC 994(f) ("The Commission... shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.")

In 2007, more than two decades after the statute was enacted, the Commission responded. It issued a guideline stating that "extraordinary and compelling reasons" include medical conditions, age, family circumstances, and other reasons." USSG 1B1.13 Comm. n. 1(A)

As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the Bureau of Prisons. But during the span of more than three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria see, e.g. Dept. of Justice,

(2)

Office of the Inspector General, The Federal Bureau of Prisons Compassionate Release Program (April 2013), at 11 available at https://oig.justice.gov/reports/2013/e1306.pdf ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered"); USSG 1B1.13, n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates).

B.

Compassionate Release After the First Step Act

Through the First Step Act, Congress sought to resuscitate compassionate release by, inter alia, allowing defendants to directly petition courts for relief, rather than leaving that power solely in the hands of the BOP. See 18 USC 3582 (c)(1)(A). The Compassionate Release Statute, as amended by the First Step Act authorizes courts to grant relief whenever "extraordinary & compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 USC 3553(a) and applicable policy statements issued by the Commission – regardless of the BOP's position. Thus, Courts no longer need to await a motion from the BOP, which tended to limit "extraordinary & compelling" circumstances to cases where the defendant suffered from a terminal illness. Instead, courts may amend a sentence "upon motion of the defendant" after exhausted administrative remedies with the BOP, or after 30 days following the Warden's receipt of a compassionate release request, whichever comes first. 18 USC 3582(c)(1)(A).

Considering the First Step Act's objective to increase courts flexibility to grant compassionate release and minimize the BOP's role in the process, Courts are no longer constrained by the BOP's determination of when relief is warranted.

This is because those portions of the Commission's policy statement delegating to the BOP Director the power to decide what are "extraordinary and compelling reasons" are in conflict with the amended statute. See, e.g. United States v. Cantu, 2019 WL 2498923, at *3-4 (S.D. Tex June 17, 2019) (vesting BOP with authority to determine whether extraordinary & compelling reasons are present "no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the court); United States v. Ebbers 2020 WL 91399 at *4 n.b. (S.D. NY) Jan 8, 2020 ("[T] the First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts. Deferring to the BOP would seem to frustrate that purpose.")

Now that power lies where Congress intended in the courts and in the year-plus since the First Step Act took effect, courts have "significantly expanded the scope of compassionate release, finding "extraordinary and compelling reasons" in circumstances wholly apart from which the BOP narrowly relied (age, medical conditions, and family needs) See e.g. United States v. Cantu-Rivera 2019 WL 2578272 at *2 n.1 (S.D. Tex) June 24, 2019; United States V. Cantu 2019 WL 2498923, at *5 (S.D. Tex June 17, 2019 (Garcia Marmolejo).

Now that courts are no longer constrained by the BOP's narrow interpretation of "extraordinary and compelling reasons, they have embraced their broad discretion under 18 USC 3582(c)(1)(A) to grant compassionate release.

ARGUMENT

The COVID-19 pandemic which poses particular dangers to medically vulnerable inmates, presents "extraordinary & compelling reasons" that justify compassionate release.

On March 11, 2020, the World Health Organization (WHO) officially classified the spread of COVID-19, the disease caused by novel coronavirus, as a pandemic.[3] On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 USC 1601 et seq.[4] Several days later, the White issued guidance recommending that gatherings of 10 (ten) or more persons be canceled or postponed.[5] In the weeks since these pronouncements COVID-19 has continued to spread at alarming rate. As of April 23, 2020, more than 2.7 million people have been infected globally and nearly 100,000 people have died. In the United States, more than 1 million people have been infected & more than 100,000 people have died.[6] (The numbers, which increase sharply everyday, almost certainly underrepresent the true scope of the crisis in the U.S., considering the widespread unavailability of test kits to detect the virus.) To stem the spread of the disease, the CDC has broadly advised people to take basic preventive actions such as surface disinfected and frequently washing their hands, staying 6 feet away from others, and avoiding crowds.[7] At the same time public health experts have reasoned that incarcerated individuals are at special risk of infection & are less able to participate in proactive measures to keep themselves safe.[8] Indeed the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.

To this day, inmates must share communal living spaces, such as cells, dining halls, recreation rooms, and libraries. To make matters worse, hand sanities, an effective disinfectant recommended by the CDC to reduce transmission is deemed forbidden "contraband" in BOP facilities because of its alcohol content. Despite the BOP's efforts to take precautionary measures they are woefully unprepared to contain the virus's spread.

In fact, there are so many presumptive cases of the disease at the FCI in Oakdale, Louisiana (where two inmates with underlying medical conditions already have died) that the facility stopped conducting tests.[12] In the alarming crisis that is unfolding, the universally recommended antidote is simple: reduce the prison population.

Courts are increasingly heeding the call from legal and medical experts by releasing vulnerable inmates from overcrowded facilities. See e.g. United States v. Colvin, 2020 WL 1613943 (D. Conn April 2, 2020); Miller v. United States 2020 WL 1814084 (E.D. Mich Apr 9, 2020); United States v. Avenatti, No 8:19-cr-61 (S.D. Cal Mar 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); United States v. Copeland, No 2:05-cr-135-DCN (D.S.C Mar 24, 2020) granting compassionate release to defendant in part due to Congress desire for courts to release individuals with ailments that defendant has during this current pandemic.")

C.
This Court has the authority to reduce sentence by waiving the exhaustion requirement because Mr. Johnson is at risk of contracting a fatal disease. Under 18 USC 3582(c)(1)(A), a defendant ordinarily must exhaust administrative remedies with the BOP or wait 30 days after submitting a request for compassionate release to the warden, whichever comes first, 18 USC 3582(c)(1)(A). But these are not ordinary times, the courts may waive these administrative laws including "well established exceptions to exhaustion;" Ross v. Blake 136 S Ct 1850, 1863 (2013) recognizing futility, constitutional claims as exceptions; Woodford v Ngo 548 US 81, 108 (2006).

Thus when a defendant is facing irreparable harm and futility if exhaustion is required, courts have waived exhaustion of administrative remedies. See e.g., Garza v. Davis

596 F.3d 1198, 1203-04 (10th Cir. 2010) (Recognizing Futility Exception in context of 2241 petition); Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 239 n.2 (3d Cir. 2005) [e]xhaustion would be futile, given that Woodall is not challenging the application of the BOP regulations, but their validity. Boucher v. Lamanna 90 F. Supp. 2d 883, 887 (N.D. Ohio 2000) (concluding that exhaustion of administrative remedies would be futile where the BOP's policy on categorizing inmates offense as violent crime was mandatory, the issue was legal one that BOP had consistently defended, and potential for immediate release counseled timely consideration of petitioner's case); Cushenberry v. Federal Medical Center 530 F. Supp. 2d 908, 912 (E.D. Ky 2008); Snyder v. Angelini 2008 WL 4773143 *2 (E.D.N.Y Oct 27, 2008); Zucker v. Maniffee 2004 WL 102779 *4 (S.D. NY Jan 21, 2004).

The First Step Act did not alter this precedent; both the administrative exhaustion procedure & the circumstances meriting its' waiver remain unchanged. Indeed, Courts throughout the country have continued to waive the administrative exhaustion requirements under the First Step Act, where circumstances warrant, see Washington v. Bureau of Prisons 2019 WL 6255786 at *2 (N.D. Ohio July 3, 2019) (In addressing motion for recalculation of good time credit under the First Step Act, the court explained that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile"). United States v. Walker No 3:10-CR-00298-RRB-1, ECF 110 (N.OR Feb 7, 2019) Urzi v. Marques 2019 WL 6481212, at *2 (D. Minn Oct 10, 2019)

In the compassionate release context, Courts have recognized that under the right circumstances, seeking relief from BOP may be futile, warranting the waiver of a defendant's failure to exhaust administrative remedies - including because of COVID-19, see e.g. United States v. Powell 2020 WL 1698194 (D.D.C. Mar 28, 2020)

(7)

United States v. Zukerman 2020 WL 1659880 (S.D. N.Y. April 3, 2020)(waiving exhaustion requirement and reducing sentence to time served); Indeed, Mr. Johnson notes that two court cases in this district have already granted motions for compassionate release without requiring exhaustion, see Order; United States v. Muslek 4:18-CR-197 (S.D. Tex. Apr 22, 2020)(Gilmore)[13] Order United States v. Brannan 4:15-CR-80 (S.D. Tex. Apr 2, 2020) (Rosenthal, L)[14]

In sum, Courts excuse exhaustion requirements if it appears that an administrative appeal would be futile or because the appeals process is shown to be inadequate to prevent irreparable harm to the defendant. Those circumstances are present here. The futility & potentially-irreparable harm of requiring Mr. Johnson to wait a minimum of 30 days for the Warden to respond or to exhaust administrative remedies are manifest. Mr. Johnson seeks to avoid contracting coronavirus at FMC Ft. Worth, where the risk of an infection is unreasonably high due to crowded facilities, inability to "social distance" from other inmates and correctional staff, the scarcity of sanitizing products and the obvious growing out-break of infected persons over the past few weeks of infections of COVID-19 among inmates at FMC Ft. Worth have leaped from 412 to 675.

Waiting to exhaust administrative remedies would only compound the risk Mr. Johnson will be exposed to COVID-19, a disease that has spread exceptionally quickly. If Mr. Johnson were to contract the disease while awaiting an administrative response, it would likely come too late, leaving in grave danger and rendering his (Mr. Johnson) compassionate release motion moot.

A further reason to excuse Mr. Johnson failure to exhaust all administrative remedies is that the BOP had known for months of the impending COVID-19 crisis and thus had ample opportunity to adequately prepare for the emerging health crisis. The BOP was on notice of the potential danger to inmates in certain health conditions, it would be irrational to force to wait while the BOP takes additional time considering an administrative request. In these extraordinary circumstances, the court should waive the administrative exhaustion requirements in 18 USC 3582(c).

D)
The relevant 18 USC 3553(a) sentencing factors warrant reducing Mr. Johnson sentence to time served and substituting a condition of home confinement with the possibility of a ankle monitor. Under the compassionate release statute, where a defendant establishes the existence of "extraordinary and compelling circumstances" justifying relief, courts must consider the physical health and the unique danger of contracting COVID-19 and becoming severely ill.

Release plan is stable

In this case, like those cited above, infra at 10-13, a reduction of sentence would not diminish the offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19 compounded by the heightened risks faced by Mr. Johnson whose ability to engage in basic **self-protective measures** is restricted, warranting compassionate release.

(9)

ACCORDINGLY MR. JOHNSON SEEKS AN ORDER REDUCING SENTENCE TO TIME SERVED AND MODIFYING JUDGMENT TO ADD A CONDITION OF HOME CONFINEMENT OF WHATEVER DURATION THE COURT DEEMS APPROPRIATE.

REFENCES


1) COUNSEL FILES THIS MOTION UNDER SEAL DUE TO THE NEED TO DISCUSS AND PROVIDE RECORDS OF HEALTH CONDITION

2) GROUPS AT HIGHER RISK FOR SEVERE ILLNESS, CENTERS FOR DISEASE CONTROL & PREVENTION (VISITED APR 24, 2020) (HTTPS://WWW.CDC.GOV/CORONAVIRUS/2019-NCOV/NEED-EXTRA-PRECAUTIONS/GROUPS-AT-HIGHER-RISK.HTML)

3) "WHO CHARACTERIZES COVID-19 AS A PANDEMIC," WORLD HEALTH ORGANIZATION (MARCH 11, 2020), AVAILABLE AT HTTPS://BIT.LY/2W8DWPS

4) THE WHITE HOUSE, PROCLAMATION ON DECLARING A NATIONAL EMERGENCY CONCERNING THE NOVEL CORONAVIRUS DISEASE (COVID-19) OUTBREAK (MARCH 13, 2020) AVAILABLE AT HTTPS://WWW.WHITEHOUSE.GOV/PRESIDENTIAL-ACTIONS/PROCLAMATION DECLARING-NATIONAL-EMERGENCY-CONCERNING-NOVEL CORONAVIRUS-DISEASE-COVID-19-OUTBREAK.

5) SHERI FINK "WHITE HOUSE TAKES NEW LINE AFTER DIRE REPORT ON DEATH TOLL, NEW YORK TIMES (MARCH 17, 2020)

6) "COVID-19 CORONAVIRUS PANDEMIC" AVAILABLE AT HTTPS://WWW.WORLDOMETERS.INFO/CORONAVIRUSUPDATES.

7) "ID"

8) ACHIEVING A FAIR AND EFFECTIVE COVID-19 RESPONSE - AN OPEN LETTER TO VICE-PRESIDENT MIKE PENCE, AND OTHER FEDERAL, STATE, AND LOCAL LEADERS FROM PUBLIC HEALTH.

9) JOSEPH A BICK, "INFECTION CONTROL IN JAILS AND PRISONS," CLINICAL INFECTIOUS DISEASE 45(8)-1047-1055 (2007); SICK STAFF, INMATE TRANSFERS, AND NO TESTS: HOW THE U.S. IS FAILING FEDERAL INMATES AS CORONAVIRUS HITS.

10) FEDERAL BUREAU OF PRISONS COVID-19 ACTION PLAN


REFENCES

11) KERI BLAKINGER & BETH SCHWARZAPFEL, "HOW CAN PRISONS CONTAIN CORONAVIRUS WHEN PURELL IS CONTRABAND? ABA JOURNAL (MARCH 13, 2020)

12) SEE NICHOLAS CHRASTIL, "LOUISIANA FEDERAL PRISON NO LONGER TESTING SYMPTOMATIC INMATES FOR CORONAVIRUS DUE TO SUSTAINED TRASMISSION," THE LENS (MAR 21, 2020); BOP PRESS RELEASE, "INMATE DEATH AT FCI OAKDALE I" (APR 1, 2020)

13) MOTION DRAFTED BY PHILIP C. GALLAGHER (IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION) UNITED STATES v. JOSE EDGAR GARCIA [NO. H-16-0569]

## Summary

Mr. Johnson humbly seeks the attention of the court, for he has now served approximately twenty-four years (24) on a three-hundred and sixty month sentence (360), with twenty-four months left to serve on his sentence. In 2018, Mr. Johnson has a medical condition in which affects his lungs.[1] Since the Covid-19 pandemic Mr. Johnson incarceration at FMC Ft. Worth Medical Center renders him vulnerable to complications of Covid-19, coupled with his weakened lung condition could result in costly medical costs and/or death. For the following reasons herein this instant motion application, Mr. Johnson seeks compassionate relief for the following reasons...

I. Mr. Johnson Medical Condition (Lung Infection T.B.)

a. Lung Infection

As recently as of 2018, Mr. Johnson has contracted a lung infection and was treated on three occasions for the infection. No follow-up nor X-rays on the condition of his lungs was conducted since then. Therefore with no record of how much the damages of his lung complication was with his exposure to T.B., amid the Covid-19 virus, this may have an insidious affect which could lead to Mr. Johnson having severe complications or even become fatal if he contracts the virus at Fort Worth Medical Center.

b. <u>FT. WORTH MEDICAL CENTER</u>

FORT WORTH MEDICAL CENTER HISTORY OF EXPOSURE TO COVID-19 IN MAY OF 2020 WENT TO ABOUT SIX HUNDRED AND SEVENTY-TWO POSITIVE (672) CASES OF COVID-19 INMATES TEST RESULTS, FOR WHICH WAS THE HIGHEST PRISON POPULATION OF THE VIRUS IN TEXAS AND ONE OF THE HIGHEST IN THE FEDERAL SYSTEM BESIDE OAKDALE AND TERMINAL ISLAND FEDERAL INSTITUTIONS. TWELVE DEATHS HAS OCCURRED AS A RESULT OF COVID-19 HERE AT FT. WORTH MEDICAL CENTER (FMC) DUE TO...

THE INFUSTRATION OF THE PRISON INSTITUTION WITH AN OVER-CROWDED INMATE POPULATION...

WHICH MAKES IT VIRTUALLY IMPOSSIBLE TO ADHERE TO THE CENTER OF DISEASE CONTROL (CDC) TO PRACTICE SOCIAL DISTANCING, SANITATION, AND TO PREVENT CONTRACTING AND SPREADING OF THE VIRUS.

THIS (FMC) IS A "HOT-BED" FOR THE VIRUS WHERE IT CAN POTENTIALLY HOST FROM INMATE TO INMATE, INMATE TO STAFF, WITH THE POSSIBILITIES OF STAFF TO SOCIETY. FOR THIS SIMPLY FACT..

① IMPOSSIBLE TO ADHERE TO CDC's PROTOCOL OF SOCIAL DISTANCING

② IMPOSSIBLE TO HAVE A SANITIZE ENVIRONMENT SINCE IT IS NOT AUTHORIZED WITHIN INSTITUTIONS TO HAVE ANY TYPE OF ALCOHOL PRODUCTS NOR BLEACH AS WELL AS AMMONIA.

INMATES OF A POPULATION OF THREE-HUNDRED PER UNIT SHARE(S) ONLY ELEVEN SINKS, NINE TIOLETS, AND MAY BE TWENTY SHOWERS; WHEREAS THESE UTILITIES CAN CONTAIN THE VIRUS ON ITS SURFACE UP TO FIVE DAYS AND INFECT AN ENTIRE UNIT. OUT OF THREE HUNDRED AND SIXTY PLUS INMATES STAFF INFORMED US IN MR. JOHNSON UNIT ONLY THIRTY INMATES WERE NEGATIVE.

(13)

FMC Medical Center holds a population of inmates with severe tentative medical issues and conditions like Mr. Johnson. A second-wave of COVID-19 virus to hit in the coming weeks it will become very severe to the inmate population if it is not decrease. ~~Sentence not~~ Granting Mr. Johnson on his motion of home confinement among other medical patiences and inmates at the institution will create an adherence to the CDC social distancing policies which will...

1. Save live and prevent the spread of the virus
2. Allow inmates and staff to practice social distancing
3. Allow laundry to sanitize and wash more frequently
4. Allow the prison with less inmates to more supplies that'll last instead of running out because of overpopulation

Non-compliance to CDC policies and protocols in which this FMC is in violation of, will most certainly result in numerous fatalities in the near future.

(14)

## Conclusion

Your Honor how can the prison keep the contraction and infection rate of the novel Coronavirus (COVID-19) down if we (inmates) are in a environment that is no social distancing and a high population with no way of keeping exposure but to reduce the prison population.

WHEREFORE: Petitioner prays that this court order grants the release to him for home confinement and anything that the courts deems necessary for the remainder of his term of imprisonment.

Date: May 26, 2020

Respectfully Submitted

*Aristede M. Johnson*
ARISTEDE M. JOHNSON 72901-079
FMC FT. WORTH
P.O. BOX 15330
FT. WORTH, TEXAS 76119

## Certificate of Service

I certify that a copy of the forgoing was sent on this 26th day of May, 2020 by U.S. Mail to: U.S. Attorney Southern District of Texas Houston Division at 515 Rusk St, 5300 Federal Bldg Houston, Texas 77002.

*Aristede M. Johnson*
ARISTEDE M. JOHNSON 72901-079
FMC FT. WORTH
P.O. BOX 15330
FT. WORTH, TX 76119

(15)

